# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| JERRY GENE HERRON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:09-CV-519-PPS-CAN |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Everyone seems to agree that Jerry Herron suffers from bi-polar disorder and other mental illnesses. But following a hearing before an administrative law judge, Herron was denied Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) because the ALJ did not find him to be credible and because, in the view of the ALJ, his impairments were not severe enough to prevent Herron from doing simple, repetitive jobs. Herron asks this Court to reverse the ALJ's decision. Because I find that the ALJ improperly ignored evidence in the record that supported Herron's claim, I am remanding this matter to the ALJ to fully and properly develop the administrative record.

## Procedural History

Herron applied for DIB and SSI on July 5, 2006, alleging disability beginning on June 26, 2006, due to bipolar disorder, schizoaffective disorder and muscle strain [Tr. 14, 97-100 & 120]. At a hearing before the ALJ on September 10, 2008, Herron, his ex-wife Tena Herron, his step-son Chad Morris, and vocational expert Joseph Havernack all testified [Tr. 29]. The ALJ eventually denied Herron's claim, finding that he was not disabled under the Social Security Act, [Tr. 22]. After the Appeals Council denied Herron's request for review [Tr. 1-3], this appeal

followed. Because the Appeals Council denied further review of the ALJ's decision [Tr. 1-4], that decision is treated as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981 & 416.1481; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007); (citing *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005)).

**Factual Background**

Herron is a 49-year-old man, and was 47 at the time of the ALJ's decision [Tr. 33]. He has a high school education and past relevant work experience working as a small parts molder [Tr. 34-35 & 97]. Herron claims he has been disabled since June 26, 2006 due to bipolar disorder and schizophrenia [Tr. 120]. Herron contends that the ALJ improperly relied on the opinion of the state agency psychologist, who did not examine Herron, and basically ignored conflicting evidence, including examining psychologists and psychiatrists, the HR manager at Herron's former employer, and testimony at the hearing. Thus, in setting forth the relevant factual background, I will focus on the allegedly conflicting evidence.

**A.     Employment History**

From 1998 to 2006, Herron worked as a small parts molder at Bulldog Battery, where he poured hot lead into molds, and removed the resulting parts [Tr. 35 & 275]. From 1999 through 2004, Herron received numerous employee warnings from Bulldog for tardiness, poor performance and workmanship, and absence from his work station [Tr. 275]. By 2004, Bulldog had placed Herron in a work station where he had no contact with other employees, and where his tasks were rudimentary: he examined parts and dropped them into buckets [*Id.*]. Herron was unable to perform even this simple task [*Id.*], and he stopped working on June 26, 2006 due to his disabilities [Tr. 120].

2

On July 17, 2006, Herron filed for short term disability leave from Bulldog, due to "pulled muscles and mental disorder" [Tr. 315]. Shortly thereafter, in August 2006, Herron informed Bulldog that he would not be returning to work, explaining that he could no longer perform his job [Tr. 35 & 275]. Bulldog's HR manager, Terry France, submitted a telling letter which stated that, in France's opinion, Herron "could not perform any job in a competitive employment setting" [Tr. 275].

**B.      Psychological and Psychiatric Diagnoses**

Herron first sought treatment for his psychological impairments in October 2004, at the Michiana Behavioral Health Center [Tr. 155]. At that time, Herron was taking Seroquel [Tr. at 156], an antipsychotic medication used to treat bipolar disorder and depression. Upon examination, Herron was diagnosed by Dr. Haskins, a psychiatrist, with schizoaffective disorder [*Id.*]. Dr. Haskins also gave Herron a Global Assessment of Functioning (GAF) score of 15 at that time, with the best GAF in the past year as 45 [*Id.*]. Using the GAF, a clinician rates an individual's ability to function on a scale of 1, the lowest functioning, to 100, which reflects superior functioning. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., Text Revision 2000) ("DSM-IV-TR"). By the time of Herron's November 29, 2004 discharge from the Behavioral Health Center, Dr. Haskins gave him a GAF score of 50 [Tr. 156]. Upon discharge, Herron was referred for partial treatment programming and medication management [*Id.*].

After his discharge from the Behavioral Health Center, Herron saw doctors at Family Physicians Incorporated on a number of occasions throughout 2005-2006 [Tr. 204-211]. During this time period, Dr. Levine diagnosed Herron with schizoaffective disorder, bipolar disorder,

3

and depression [Tr. 207]. However, another doctor at Family Physicians, Dr. Fishberg, doubted that Herron had bipolar disorder, but noted that schizoaffective disorder was possible [Tr. 210]. The Family Physicians doctors' notes indicate that Herron was taking a number of antipsychotic medications and antidepressants during this period, including Zoloft, Zyprexa, Seroquel and Symbyax [*Id.*]. Those notes further indicate that Herron was getting "mixed up" with respect to these medications, including by not taking them as prescribed [Tr. 207].

On August 9, 2006, Herron was given a mental status examination by a state agency psychologist, Dr. Coulter-Kern, on a referral from the Disability Determination Bureau (DDB) [Tr. 225-228]. At that time, Herron reported taking Zypraxa, Zoloft and Lamatol for mood swings, and alleged that he was disabled due to bipolar disorder, schizophrenia, schizoaffective disorder and muscle strain [Tr. 226]. Dr. Coulter-Kern diagnosed Herron with bipolar disorder, and gave him a current GAF of 45, with a GAF of 45 as the highest during the preceding six months [Tr. 228]. Dr. Coulter-Kern indicated that Herron was experiencing stress relating to his job, his inability to control his symptoms, and the fact that his wife had recently filed for divorce [Tr. 226 & 228].

On August 27, 2006, Dr. Menon performed a consultive examination of Herron for the DDB [Tr. 230-232]. At that time, Herron reported taking Zyprexa, Zoloft and Lamictal [Tr. 230]. Dr. Menon diagnosed Herron with bipolar disease and schizoaffective disorder with depression [Tr. 230-232].

On September 28, 2006, a state agency reviewing psychologist, Dr. Larsen, prepared for the DDB a mental Residual Functional Capacity (RFC) assessment, and a Psychiatric Review Technique form [Tr. 20 & 235-252]. Dr. Larsen opined that Herron's attention and

4

concentration were moderately limited, which she thought might interfere with the complex task completion required by Herron's former job at Bulldog [Tr. 237]. But she added that Herron retained the ability to perform simple, repetitive tasks, and to follow single, as opposed to multiple or complex, instructions [*Id*.]. Dr. Larsen further noted that Herron's daily living activities indicated that he was able to perform a wide range of tasks without difficulty, and that he was capable of cooperating and tolerating the casual interactions with others necessary to perform those tasks [*Id*.].

On December 11, 2006, Herron received a psychiatric evaluation by Dr. Ahmad at the Bowen Center, where Herron received treatment from that date through May 13, 2008 [Tr. 255-259]. Dr. Ahmad noted that Herron had stopped taking medications two-to-three months prior to his intake at Bowen, due to the discontinuation of his insurance [Tr. 256]. Dr. Ahmad further noted that Herron did not exhibit any symptoms of mania or depression [Tr. 258], and gave him a GAF score of 50 at admission [*Id*.]. Dr. Ahmad observed, however, that Herron was nonetheless undergoing moderate to severe psychosocial and environmental problems (Axis IV),[1] including his then wife's recent divorce filing, unemployment, and his recent application for disability [Tr. 258].

**C.     Testimony at the Hearing**

During the administrative hearing, Herron testified that his ability to work was affected by depression, occasional manic episodes, and his bipolar disorder, all of which prevented him from focusing and concentrating on what he is doing [Tr. 42 & 45]. Herron also testified that he

---

[1] Dr. Ahmad expressed his diagnosis according to the standard multi-axial system, defined in the DSM-IV-TR, where "Axis IV" refers to "psychosocial and environmental problems."

5

was then taking Sertraline, Zoloft and Abilify, and that these medications were helping with these conditions [Tr. 38]. Herron further testified that his ability to work is affected by occasional muscle soreness [Tr. 37].

As for his mania, Herron testified that it renders him "real speedy," "jumpy," "zipping all over the place," and unable to sleep, even when he is taking his medication [Tr. 50]. Herron elaborated that he is unable to focus even on simple tasks, and his thoughts are "all over the place," during these manic periods [Tr. 50 & 52]. Herron further testified that his mania, and his corresponding inability to focus, resulted in his 2005 hospitalization at the Behavioral Health Center, and his 2006 decision to take disability leave from work [Tr. 51]. Herron added that, prior to his 2004 hospitalization, his manic episodes occurred every eighteen months, and usually lasted for three-to-four weeks [Tr. 53]. He estimated that he has had six-to-seven such episodes since he quit drinking in 1997 [*Id.*].

At the time of the hearing, Herron was seeing a psychiatrist at the Bowen Center approximately once every three months [Tr. 43]. He testified that the treatment he was getting at Bowen was helping him [Tr. 44].

Herron's ex-wife, Tena Herron, also testified at the administrative hearing. Ms. Herron testified that, during the 13 years she has been with him, Herron's mania has resulted in "incidents all the time happening with him," which would keep Herron awake for several days at a time with paranoia and frustration [Tr. 55]. She further testified that, prior to Herron's 2004 hospitalization at the Behavioral Health Center, Herron's manic episodes would cause him to engage in behavior such as tearing out walls without knowing how to put them back, and setting her car on fire without knowing what he was doing [Tr. 56].

6

As to Herron's ability to understand what is going on around him, Ms. Herron testified that "it doesn't seem like he's in our world," and that this happens "all the time" [Tr. 58]. For example, she said he would use her car and truck, but return home with serious damage to the vehicles, which he was unable to explain [Tr. 59]. Ms. Herron testified that she believed Herron did not know what had happened in such instances [*Id.*]. As to her relationship with Mr. Herron, she felt like it was more like a parent-child relationship than a husband-wife one [Tr. 60].

Herron's 32-year-old stepson, Chad Morris, also testified at the administrative hearing. Morris, who lived with Herron and Ms. Herron from 2001 to early 2007, testified that Herron's ability to concentrate was "very, very, very poor" [Tr. 61]. Morris described Herron during his manic episodes as being "very, very flighty," talking about nonsense, "completely off the wall," and staying up into the early morning hours engaged in chaotic behavior [Tr. 62]. When asked how often Herron engaged in this sort of behavior, Morris described it as occurring "all the time" [Tr. 63].

A vocational expert, Joseph Havernack, also testified at the hearing, via telephone. Havernack stated that there would not be any jobs available for Herron in the relevant region if the ALJ found Herron's testimony credible, and the medical evidence supported Herron's alleged impairments [Tr. 65]. Havernack added that the depressive-to-manic mood swings caused by Herron's bipolar condition was the primary reason such jobs would not be available to him [*Id.*]. And indeed, as referenced above, this was consistent with what Herron's employer said: that Herron "could not perform any job in a competitive employment setting" [Tr. 275].

7

**D.     Summary of the ALJ's Decision**

The ALJ found that Herron easily satisfied the first two steps of the five-step inquiry. At Step One, the ALJ determined that Herron had not been engaged in substantial gainful activity since the onset of his disability [Tr. 16]. The ALJ then found that Herron satisfied Step Two because he had a combination of the severe impairments of bipolar disorder and schizoaffective disorder [*Id.*].

At Step Three, the ALJ considered whether Herron's severe mental impairments met or medically equaled any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 12.04, which concerns "affective disorders," and is therefore the relevant listing in this case. Relying only on the opinion of Dr. Larsen, the ALJ determined that Herron's bipolar disorder and schizoaffective disorder, considered singly or in combination, did not meet or medically equal the criteria of Listing 12.04 [Tr. 17]. The ALJ then found that Herron satisfied Step Four because he was unable to perform his past relevant work as a production worker [Tr. 21]. Finally, at Step Five – whether Herron would be able to perform any work – the ALJ found that, in light of Herron's age, education, work experience, and RFC, there are significant numbers of jobs in the national economy that he can perform [Tr. 21].

**DISCUSSION**

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The reasons the ALJ gives for his determination must build a "logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Even if reasonable minds could differ as to

the appropriate conclusion, as long as the ALJ's decision is supported by substantial evidence, it should be upheld. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

An applicant for disability insurance benefits must establish "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505. The SSA's regulations prescribe the familiar five-step sequential inquiry for an ALJ to determine whether an applicant is disabled: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

A claimant will automatically be found disabled if he satisfies steps one, two and three. However, "if a claimant satisfies steps one and two, but not three, then she must satisfy step four." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citation omitted). The initial burden in steps one through four is on the plaintiff, and the burden shifts to the Commissioner only at step five. *Clifford*, 227 F.3d at 868 (citing *Knight*, 55 F.3d at 313).

## A.     Herron's Objection to the ALJ's Determination at Step Three

The only issue Herron raises is whether the ALJ erred in making his Step Three determination that Herron did not meet or medically equal the requirements of Listing 12.04.

Specifically, Herron contends that, in finding that he did not have a listed impairment, the ALJ improperly relied on Dr. Larsen's opinion, while ignoring a rash of competing evidence: the opinions from examining psychologists and psychiatrists, the submission from Terry France, his former HR manager, and the testimony from his former wife and step-son all of which was arguably contrary to Dr. Larsen's conclusions.

### 1. Analysis of the "Paragraph B" and "Paragraph C" Criteria

The ALJ's Step Three finding that Herron did not meet or medically equal the requirements of Listing 12.04 was based on his determination that Herron did not meet the "Paragraph B" or "Paragraph C" criteria of that Listing. Under Listing 12.04, a claimant must meet the "Paragraph A" criteria, and then also either the "Paragraph B" or "Paragraph C" criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. The ALJ did not discuss whether Herron had presented sufficient evidence to meet the Paragraph A criteria, apparently assuming that he had.[2] I will also make that assumption. So Herron's challenge to the ALJ's Step Three determination comes down to whether the ALJ correctly evaluated the criteria for Paragraphs B and C.

The Paragraph B criteria require the presence of at least two of the following for a claimant to be considered disabled: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Larson v. Astrue*, 615 F.3d 744, 748 (7th Cir. 2010) (citing 20 C.F.R. Pt. 404, Subpart P., App. 1,

---

[2]The criteria in Paragraph A medically substantiate the presence of the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

§ 12.04(B)). Thus, satisfaction of the Paragraph B criteria requires that Herron's mental impairments cause at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(4) (rating the degree of limitation in this functional area on a five-point scale: none, mild, moderate, marked, and extreme).

Relying only on Dr. Larsen's opinion, the ALJ concluded that Herron did not satisfy the Paragraph B criteria because Dr. Larsen opined that Herron had only mild restrictions in his ability to perform activities of daily living; moderate difficulties in his ability to maintain social functioning, and his ability to maintain concentration, persistence or pace; and no episodes of decompensation [Tr. 17 & 249].

The ALJ's mistake was ignoring evidence in the record that supports a finding that Herron has a "marked" restriction as to the Paragraph B criteria. The record contains evidence supporting at least two of the Paragraph B criteria: (1) a "marked restriction of activities of daily living" is demonstrated, for example, by the evidence that Herron would cause severe damage to the family vehicles, including by setting them on fire, yet have no idea that he had even done so [Tr. 56 & 58-59], that his ex-wife was forced to treat him like a child [Tr. 60], and that he was incapable of performing simple household duties [Tr. 56. & 61]; and (2) "marked difficulties in maintaining concentration, persistence, or pace" is evidenced, for example, by Herron's step-son's testimony that Herron's "ability to concentrate is very, very, very poor" [Tr. 61], the submission from his former employer that Herron was not even able to perform the simple task of dropping parts into a bucket, and that, at work, Herron "would be hyperactive, his ideas would skip from one to another, he would be easily distracted" [Tr. 275], and Herron's step-son's description of Herron's "very, very flighty" and chaotic behavior [Tr. 62].

Testimony such as this from family members and employers who were in a position to observe the claimant's symptoms and daily activities is competent and probative evidence. 20 C.F.R. § 404.1529(a) & (c)(3); *Boiles v. Barnhart*, 395 F.3d 421, 424-26 (7th Cir. 2005) (ALJ improperly ignored claimant's cousin's testimony at Step Three); *Barnett v. Barnhart,* 381 F.3d 664, 668-670 (7th Cir. 2004) (ALJ improperly discredited claimant's husband's testimony at Step Three); *Godbey v. Apfel*, 238 F.3d 803, 809-810 (7th Cir. 2000) (ALJ erred in not considering the testimony of claimant's sister as to claimant's mental condition); *accord Narrol v. Heckler*, 727 F.2d 1303, 1306-1307 (D.C. Cir. 1984).

The ALJ also found that Herron did not satisfy the "Paragraph C" criteria,[3] reasoning that there was no evidence that Herron had extended episodes of decompensation, or that he was unable to function outside of a highly supportive living arrangement [Tr. 17]. This finding is flawed in two respects. First, the ALJ does not mention the evidence he relied on in making this determination. The ALJ could not properly have relied on Dr. Larsen's opinion here, because

---

[3]Listing 12.04, paragraph C requires:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Dr. Larsen did not complete the section of the Psychiatric Review Technique form that called for her opinion as to the Paragraph C criteria [Tr. 250]. What's troubling about this, of course, is that the ALJ relied on Dr. Larsen in every other respect in his Step Three analysis.

Second, the record contains evidence that Herron satisfied at least one of the Paragraph C criteria. Specifically, there is evidence that Herron was unable to function outside of a highly supportive living arrangement, such as Herron's ex-wife's testimony that she had to treat Herron like a child [Tr. 60], that she had to seek help for him because his capabilities became progressively more limited, and that "he didn't ever seem to know what he was doing" [Tr. 56].

The ALJ also observed that Herron's mental impairments were well-controlled when he was taking his medication, but ignored the evidence that Herron does not always take his medications as prescribed, gets confused as to which medications he is supposed to be taking, and has a history of stopping his medications altogether. As the Seventh Circuit recently noted, "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). And antidepressant drugs of the sort Herron has been taking for some time now "often produce side effects that make patients reluctant to take them." *Id.* (citing *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010)). What's more, as the Seventh Circuit recently noted, people with mental illness have good days and bad days, and so a "snapshot of any single moment says little about [their] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

It is true, of course, that the Court owes deference to the Commissioner's findings. But the Commissioner, through the ALJ, must articulate those findings in a meaningful way that renders them susceptible to review. In particular, the ALJ has a duty to fully develop the record

13

before drawing any conclusions, and he must adequately articulate his analysis so that the district court can trace the path of his reasoning, and can conclude that he built an accurate and logical bridge from the evidence to his decision.  20 C.F.R. § 416.912(d); *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)*, Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Clifford*, 227 F.3d at 872; *Carlson v. Shalala*, 999 F.2d 180, 181(7th Cir. 1993).

Moreover, although the ALJ is not required to mention or articulate his evaluation of each piece of evidence in the record, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Getch*, 539 F.3d at 480, he cannot *only* discuss evidence that supports his ultimate conclusion, while ignoring evidence to the contrary.  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).  And this is especially true when the ALJ decides to disregard the opinion of treating physicians.  *Punzio*, 630 F.3d at 713.

In sum, the ALJ's finding at Step Three was improper because, in evaluating the Paragraph B criteria, the ALJ addressed only Dr. Larsen's opinion, and not the competing evidence.  It may well be the case that the ALJ considered such evidence and properly discounted it, but his opinion leaves the Court with no way to tell.  The ALJ's failure to provide any rationale for discounting this evidence is reversible error.  So is the ALJ's failure to explain what evidence, if any, he considered in finding that Herron did not satisfy the Paragraph C criteria.  Therefore, this matter is remanded for elaboration on the ALJ's analysis and reconsideration of his determination at Step Three.

2. **Credibility Determination**

Among the evidence contrary to Dr. Larsen's opinion that the ALJ ignored at Step Three

14

was Herron's own testimony, presumably because the ALJ found that it was not credible [Tr. 19]. Herron's testimony as to his racing thoughts and inability to focus [Tr. 50] supplies additional evidence to demonstrate that he has a "marked" restriction as to at least one of the Paragraph B criteria – namely, (2) "marked difficulties in maintaining concentration, persistence, or pace."

Where, as here, the medical evidence shows the existence of an underlying impairment that reasonably could be expected to produce the claimant's symptoms, the ALJ must "determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994). "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p; *see also* 20 C.F.R. § 402.35(b)(1) (social security rulings are binding on the SSA).

The Commissioner is in the best position to observe witnesses and make credibility determinations, which are entitled to "considerable deference" as long as those determinations have some support in the record. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Dixon*, 270 F.3d at 1178-79. Thus, the Court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Prochaska*, 454 F.3d at 738 (citation omitted). And if the ALJ gives specific reasons for his credibility determination, which are supported by the record, his determination will stand. *Murphy*, 496 F.3d at 635.

But the ALJ may not disregard a claimant's testimony about the severity of his symptoms without providing careful analysis. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353-55 (7th Cir. 2005); *Golembiewski v.*

15

*Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003). This analysis is particularly important here because the vocational expert testified that, if the ALJ believed Herron's testimony, and his impairments were supported by the evidence, there would be no jobs that Herron could perform [Tr. 65].

In addressing the credibility of Herron's testimony, the ALJ employed substantially the same boilerplate language that the Seventh Circuit routinely criticizes as insufficient, stating that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment" [Tr. 19]. *See Martinez*, 630 F.3d at 696; *Phillips v. Astrue*, 2010 WL 5421351, at *9 (7th Cir. Dec. 23, 2010); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reversing the ALJ's credibility determination because the statement that the claimant was not entirely credible did not indicate what weight the ALJ gave the testimony); *Murphy*, 496 F.3d at 635.

The ALJ's finding that Herron's statements "are not credible to the extent they are inconsistent" with the RFC assessment gives no indication of the weight, if any, the ALJ gave to Herron's testimony, or the respects in which the ALJ found that testimony inconsistent with the RFC assessment. *Cf. Phillips*, 2010 WL 5421351, at *9. Also troubling is the ALJ's failure to give any specific reasons for doubting Herron's credibility, despite the evidence that appears consistent with Herron's testimony as to his symptoms, *e.g.*, the testimony from Herron's ex-wife and step-son as to Herron's impairments, which the ALJ did not mention in discrediting Herron's testimony. *Cf. id.*; *Spiva*, 628 F.3d at 350 (reversing the ALJ's determination of credibility because the ALJ's finding that the claimant was a malingerer was inconsistent with the record); *Murphy*, 496 F.3d at 635 (reversing ALJ's credibility determination in part for

16

failure to discuss school officials' observations that supported disability finding); *Ribaudo v. Barnhart*, 458 F.3d 580, 584-585 (7th Cir. 2006) (reversing ALJ's credibility determination because the ALJ did not indicate which medical evidence was inconsistent with claimant's allegations of pain and did not discuss claimant's explanation for not taking prescription medicine).

In sum, the ALJ's credibility findings are not supported by sufficient analysis. Accordingly, on remand, the ALJ should clarify the basis for his credibility finding.

**B.     Unsigned Medical Evaluation**

Herron argues in his reply brief, for the first time, that the ALJ's reliance on Dr. Larsen's opinion was improper because Dr. Larsen did not sign it [DE 18 at 3]. Because Herron raised this argument for the first time in his reply brief, he has waived it, and I will therefore not rule on it. *See Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (refusing to consider argument raised for the first time on reply by applicant for disability benefits); *Anderson v. Astrue*, No. 1:09-CV-00327, 2010 WL 3522574, at * 9 n.7 (N.D. Ind. Aug. 31, 2010) (same).

On remand, however, the ALJ would do well to consider that an unsigned medical evaluation cannot provide the substantial evidence needed to uphold an ALJ's RFC determination. *See Terry*, 580 F.3d at 476 (citing 20 C.F.R. § 404.1519o). According to the regulations, the signature verifies that "the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided with respect to the history, examination and evaluation of laboratory test results." *Id.* (quoting 20 C.F.R. § 404.1519n(e)). Dr. Larsen's opinion, which the ALJ adopted and gave the greatest weight to, is rubber stamped with her name [Tr. 237]. But the regulations provide that a

"rubber stamp signature" does not satisfy the signature requirement. 20 C.F.R. § 404.1519n(e).[4]

## C. Attorney's Fees and Costs

Herron seeks attorney's fees and costs pursuant to 42 U.S.C. § 406(b)(1) and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d) [DE 16 at 19]. In support of his § 406(b) request, Herron submits a contingency fee arrangement with his attorney, which provides for attorney's fees in the amount of 25% of all past-due benefits if Herron is successful in obtaining benefits at a new hearing [DE 16-1].

Herron's request for fees and costs under the EAJA is incomplete. Under the EAJA, Herron is entitled to recover his attorney's fees provided that: (1) he was a "prevailing party"; (2) the Commissioner's position was not "substantially justified"; (3) there exist no "special circumstances" that would make an award unjust; and (4) he filed a timely and complete application with the district court. 28 U.S.C. § 2412(d)(1)(A); *Conrad v. Barnhart*, 434 F.3d 987, 990 (7th Cir. 2006). EAJA fees are determined by the time spent on the case and a reasonable hourly rate capped at $125.00 per hour. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 796 (2002); 28 U.S.C. §§ 2412(d)(1)(B), 2412(d)(2)(A).

The remand I am ordering here makes Herron the "prevailing party" under the EAJA.

---

[4] 20 C.F.R. § 404.1519n(e) provides in pertinent part:

All consultative examination reports will be personally reviewed and signed by the medical source who actually performed the examination. . . . The signature of the medical source on a report annotated "not proofed" or "dictated but not read" is not acceptable. A rubber stamp signature of a medical source or the medical source's signature entered by any other person is not acceptable.

*See Shalala v. Schaefer*, 509 U.S. 292, 302 (1993) (remand under sentence four of 42 U.S.C. § 405(g) makes the plaintiff a prevailing party under the EAJA). But Herron fails to comply with the EAJA's requirements as to the information he must submit along with an application for fees and expenses, including "an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B). Nor does Herron's request include the requisite allegation "that the position of the United States was not substantially justified." *Id.*

And Herron's request under § 406(b) is premature because there has been no award of benefits. The fees awarded under § 406(b) can never exceed twenty-five percent of the past-due benefits awarded to the claimant. *Carradine v. Astrue*, No. 1:02-CV-122, 2008 WL 4776390, at *2 (N.D. Ind. Oct. 27, 2008); *Kopulos v. Barnhart*, 318 F. Supp. 2d 657, 661 (N.D. Ill. 2004); *Bartrom v. Barnhart*, No. 1:99-CV-44, 2003 WL 21919181, at *2-3 (N.D. Ind. Feb. 26, 2003). This Court is only remanding to the ALJ for further proceedings; so Herron may ultimately not be entitled to an award of benefits. In any event, the Court has no power to grant attorney's fees based on a percentage of a merely hypothetical award. *See Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 488 (7th Cir. 2004) (Article III "ensures that the resources of the federal judiciary are not expended on advisory opinions and hypothetical disputes").

So in summary, Herron's request for attorney's fees and costs under the EAJA is incomplete and the Court therefore denies it, though without prejudice to Herron's right to supplement that request as described herein. Herron's request for attorney's fees and costs under § 406(b) is also denied, albeit without prejudice to Herron's right to seek fees and costs under § 406(b) in a subsequent motion, should Herron receive an award of benefits.

19

## CONCLUSION

In light of the ALJ's inadequate analysis of credibility, and improper refusal to weigh competing evidence, the case must be returned to the Social Security Administration for further proceedings consistent with this opinion. Accordingly, Herron's motion for summary judgment [DE 16] is **GRANTED**, and this case is **REVERSED** and **REMANDED** to the Commissioner for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g). The clerk is instructed to **TERMINATE** this case.

**SO ORDERED**.

ENTERED: March 4, 2011

/s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT